**NOT FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

In re:   GLOBAL TRADING INVESTMENTS LLC,

                                     Chapter 7
                                     Case No. 04-41297 (RG)

        Debtor.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
ERIC R. PERKINS, Chapter 7 Trustee, Plaintiff,

           v.                                Adv. Proc. No: 05-1332 RTL

MARJORIE PARISE, LILLIAN PARISE &
    ROBERT PARISE,   Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

**OPINION**

**APPEARANCES:**

Hellring Lindeman Goldstein & Siegal LLP
JOHN A. ADLER, Esq.
(Attorneys for Plaintiff)

Collins Vella & Casello, LLC
JOSEPH M. CASELLO, Esq.
(Attorneys for Defendants)


**RAYMOND T. LYONS, U.S.B.J.**

       This opinion supplements an oral opinion rendered from the bench on August 21, 2006.

D.N.J. L.Civ.R. 52.1.  In his complaint, the plaintiff/trustee seeks to avoid certain prepetition

transfers of funds from the corporate debtor to the defendants pursuant to 11 U.S.C. § 544(b) and

N.J.S.A. 25:2-20 et seq.  Plaintiff moved for summary judgment and defendants cross-moved to

dismiss the adversary complaint.  Plaintiff has alleged that the corporate debtor operated a Ponzi

scheme. The defendants invested in the Ponzi scheme and received payments in return from the corporate debtor. The trustee seeks to recover all the payments made by the debtor to the defendants. On August 21, 2006, the court granted the plaintiff's motion for partial summary judgment avoiding those transfers to the defendants Marjorie and Robert Parise that exceeded the amount of their investment with the corporate debtor. Trial was scheduled on the issue of whether the defendants could prove that they gave reasonably equivalent value in good faith for the return of their investment. N.J.S.A. 25:2-30. In the course of the oral opinion, the court determined that the corporate debtor's operations were a fraudulent enterprise, therefore, all payments made to the defendants were actually fraudulent by the debtor. Some of the factors leading to the conclusion that the corporate debtor was a fraudulent enterprise were recited in the oral opinion, but the court reserved the right to supplement the oral opinion with more detailed findings of fact regarding the fraudulent enterprise.

## JURISDICTION

This court has jurisdiction of this adversary proceeding under 28 U.S.C. § 1334(b), 28 U.S.C. § 157(a) and the Standing Order of Reference by the United States District Court for the District of New Jersey dated July 23, 1984, referring all proceedings arising under Title 11 of the United States Code to the bankruptcy court. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(H) (proceedings to determine, avoid or recover fraudulent conveyances).

## FINDINGS OF FACT

Global Trading Investments, LLC, (the corporate debtor) was formed ostensibly to manage investments for customers. Individuals entrusted approximately 4.2 million dollars to the corporate debtor. Rather than invest the funds on behalf of the customers, the principal of

the corporate debtor, Brian Winters, looted the company and left little or no assets when it filed bankruptcy on September 30, 2004. Creditors' claims are in the millions of dollars.

The corporate debtor was investigated by the New Jersey Bureau of Securities (the "Bureau"). The facts[1] relied upon by the trustee in his motion for summary judgment are set forth in the Certification of Rudolph G. Bassman, Supervising Investigator with the New Jersey Bureau of Securities. He incorporated by reference a certification he had signed on March 12, 2004 in a proceeding before the Superior Court of New Jersey brought by the Attorney General of New Jersey and the New Jersey Bureau of Securities against the corporate debtor, et al. Most of the facts are also recited in a Consent Order among the Bureau, Winters and Global Trading Investments dated June 26, 2003. The facts as revealed in the Consent Order and Mr. Bassman's investigation show:

1. In July 2001, Brian Winters created the entity Global Trading Investments.

2. Global Trading Investments began offering unregistered securities to investors in the form of investments in a "private hedge fund."

3. Global Trading Investments represented to prospective investors that the securities were packaged in three funds: the Platinum Fund, the Gold Fund and the Silver Fund.

4. The Platinum Fund was represented as having the greatest risk and offering the highest rate of return.

5. The Gold Fund was represented as having a lesser risk and offering a lesser rate of return than the Platinum Fund.

---

[1] Defendants do not dispute the facts regarding the corporate debtor, but argue that they do not support the conclusion that the corporate debtor was a fraudulent enterprise.

6. The Silver Fund was represented as having the least risk and offering the lowest rate of return of the three funds.

7. Global Trading Investments offered investors a guaranteed 25% annual rate of return on their investments.

8. Global Trading Investments marketed and sold securities through sales representatives which it retained and compensated in the form of salaries and commissions of 10%.

9. Employee NK, Employee EE, Employee MM, Employee JM, Employee JP and Employee RB were among the sales representatives that sold the Global Trading Investments securities.

10. Prospective investors were directed to complete a fictitious investor suitability form which required the selection of one of the funds and the listing of the amount of money to be invested.

11. Global Trading Investments did not provide investors with any financial disclosures.

12. Although Global Trading Investments represented that it had established three distinct funds and investors were made to believe that their money would be invested in the fund they chose, all the investor money was pooled.

13. Global Trading Investments traded investor money in securities that were not previously made known to the investors.

14. Winters misappropriated the majority of investor funds.

15. Global Trading Investments transferred funds totaling $975,500.00 to the Chicago Investment Group Retail Holdings LLC for the benefit of Winters and the managing partners of CIG Retail Holdings, LLC.

16. The Chicago Investment Group LLC ("CIG") is an Illinois limited liability company engaged in broker-dealer services.

17. Winters converted investor funds to become an undisclosed principal of CIG Retail Holdings.

18. Potential investors were identified through "mooch lists" and "cold calling" that is, by using lists of known investors, by making random calls and from referrals by investors to their friends and family.

19. Global Trading Investments also used direct mail to find potential investors.

20. Prospective investors who returned the card indicating their interest received a telephone call from a Global Trading Investments sales representative who gave a brief description of the company and its purported investing strategies.

21. The Global Trading Investments sales representative then followed up with a visit to the prospective investor's home or place of business.

22. Prospective investors who expressed interest in the funds received a "media kit" from Global Trading Investments.

23. The "media kit" contained a brochure and fliers which stated to investors that "Global Trading Investments guarantees that your initial investment will return a minimum of 25% (pre tax & pre commission) by the first anniversary of your account opening".

24. The "media kit" included descriptions of the various types of funds offered by Global Trading Investments along with projections of future revenues.

25. In its Investment Guide it stated "Global Trading Investments gained 167% respectively for fiscal year 2001."

26. Global Trading Investments' internet web site contained statements such as information about Global Trading Investments' returns on investments which showed returns as high as 167% for 2001 and 90% for 2002.

27. Winters testified that these rates were false and he had conjured up the percentages to induce investors to invest in Global Trading Investments.

28. Winters testified to making false and misleading projections regarding revenue increases in order to "show that he was being successful."

29. Even though the "media kit" and internet web site contained projections based upon fiscal year 2000 and 2001, Winters testified that Global Trading Investments received its first investment in March 2002.

30. Winters testified that the "media kit" also contained false information regarding Global Trading Investments' clientele, which listed organizations such as the University of Pennsylvania, Temple University and PSE&G. He testified that these organizations were not Global Trading Investments' clients and were included in the media kit to induce potential investors to invest in Global Trading Investments.

31. Winters, through Employee NK, caused Global Trading Investments to send monthly statements to investors that contained information about the status of their investment.

32. Employee NK testified that she was given data from Winters and would calculate the client's monthly gain and input the information into the monthly statement.

33. Winters testified that the monthly statements sent to investors were fabricated. The statements contained information relating to the fund the investors had selected, the fund's monthly percentage gain, the fund's annual percentage gain, the net change for the month and

the dollar balance that was in the fund. All of this information was false.

34. Global Trading Investments' website also stated that Global Trading Investments was in compliance with the securities laws. However, Winters admitted that he knew Global Trading Investments was not in compliance with the securities law.

35. Winters represented to the Bureau that Global Trading Investments had only 57 investors and the total amount of monies invested with Global Trading Investments was $215,116.00.

36. Based on the representations made by Winters, on June 26, 2003 Brian Winters and Global Trading Investments entered into a Consent Order with the Bureau.

37. Winters and Global Trading Investments agreed to pay civil penalties in the amount of $100,000.00 over a two-year period and to comply with the Securities Law and not to engage in any act or practice in violation of the Securities Law or in furtherance of any violation thereof.

38. The Consent Order was based on the agreement that Winters and Global Trading Investments would make full restitution of principal to all Global Trading Investments investors.

39. Unbeknownst to the Bureau, up to the time and during negotiations of the Consent Order, Winters did not reveal to the Bureau that Global Trading Investments continued to solicit investors. At least 125 additional investors invested approximately $4 million dollars with Global Trading Investments.

40. Beginning March 2002, customer S.W. invested $80,000.00. S.W. submitted a Global Trading Investments statement dated September 3, 2003, which reflected a balance of $533,408.10 in his account.

41. A letter on Global Trading Investments' letterhead dated August 27, 2003, two months after the Bureau and Winters entered into the Consent Order, stated that Global Trading Investments, LLC would be operating under the name, Wyndam Group, L.P. and further explained: "this is a much more lucrative path on the road to financial success. We are looking forward to even healthier returns and a much more diversified portfolio. We hope you will share in our enthusiasm and continued financial success."

42. Bank accounts reflected from August 2002 to December 1, 2003, investor deposits totaling $4 million dollars.

43. Employees NK, EE, MM and JP testified that Winters and Global Trading Investments held quarterly and/or monthly contests for its sales representatives and the winners were awarded cars, vacations and/or cash pay-outs based upon their success in raising more investor money for Global Trading Investments.

44. Employee NK won the quarterly contest for the third quarter of 2002 and received an automobile, a BMW, valued at approximately $40,000.00.

45. Employee JP won the quarterly contest for the first quarter of 2003 and received an automobile, a BMW, valued at approximately $40,000.00

46. Employee EE won the October 2002 through December 2002 quarterly contest but opted for a cash pay-out in lieu of an automobile. Employee EE received a check in the amount of $46,200.00.

47. A monthly contest offered the new employees who solicited a certain amount of new investors a vacation.

48. Employee EE won the monthly contest for new employees and was awarded a vacation for two to St. Thomas, U.S. Virgin Islands.

49. Employee MM won the monthly contest for new employees and opted for a cash pay-out in lieu of the vacation.

50. Employee LZ (Winters' sister-in-law) testified that she was employed by Global Trading Investments as Winters' personal assistant and was awarded an automobile, a BMW valued at approximately $40,000.00 as a signing bonus.

51. The bonuses, vacations and purchasing of luxury automobiles was paid from investor proceeds.

52. The investigation also revealed that Employee NK sent letters to investors inviting them to join in a Client Referral Program where investors would earn points for recruiting other individuals to invest in Global Trading Investments. Investors were given the opportunity to win trips to New York, Atlantic City and hotel and airline tickets within the United States and abroad.

53. Testimony also revealed that Winters owns a boat. Winters acquired the boat from W.D. who invested approximately $450,000.00 with Global Trading Investments. The investigation revealed that W.D. sold Winters his boat for $125,000.00 but rather than receiving a monetary payment, W.D.'s Global Trading Investments account was credited $125,000.00.

54. There are checks payable to "Cash" drawn from the Global Trading Investments bank accounts totaling more than $800,000.00, the majority of which were endorsed by Brian Winters.

55. Winters converted Global Trading Investments investor monies to his personal

benefit.

56. There are checks payable to Southwinds Marina, where Winters' boat is docked.

57. There are checks payable to Pure Water Pools to install a built-in swimming pool at Winters' home.

58. A check payable to Santos Concrete in the amount of $8,000.00 was drawn from the Global Trading Investments account to install the patio at Winters' home.

59. A check payable to Kevin A. Fazio in the amount of $6,500.00 was drawn from the Global Trading Investments account to install a deck at Winters' home.

The state sued Winters and his companies alleging multiple violations of the securities laws and civil racketeering statutes. In response, these bankruptcy cases were filed.

The bankruptcy estates of Global Trading Investments and Wyndam Group have been substantially consolidated, i.e., they are treated as one debtor for purposes of this case. Winters has been denied a discharge.

### *Parise Investments*

Marjorie and Robert Parise are married. Lillian Parise is Robert's mother. The Parise's were solicited to invest with Global Trading Investments by Employee RB, a neighbor's in-law.[2] The defendants in this adversary proceeding invested with the corporate debtor as follows:

---

[2] Marjorie owns K&R Custom Homes that paid $100,000 to Global Trading Investments and received in return $105,000.00. K&R is not a party in this adversary proceeding.

Marjorie Parise's investment payments:

| Date | Amount |
|---|---|
| 4/11/02 | $8,000.00 |
| 5/10/02 | $20,000.00 |
| 5/13/02 | $12,750.00 |
| 8/07/02 | $75,000.00 |
| **Total:** | **$115,750.00** |

Lillian Parise's investment payments:

| Date: | Amount: |
|---|---|
| 5/07/03 | $24,200.00 |
| 5/14/03 | $5,800.00 |
| **Total:** | **$30,000.00** |

Robert Parise's made no investment.

The corporate debtor transferred the following funds to the defendants:

Marjorie Parise's investment receipts:

| Date | Amount |
|---|---|
| 1/03/03 | $70,000.00 |
| 2/07/03 | $50,000.00 |
| 3/10/03 | $15,000.00 |
| 5/20/03 | $16,000.00 |
| 7/07/03 | $278,154.91 |
| Total: | **$429,154.91** |
| Invested: | $115,750.00 |
| **Net Total** | **$313,404.91** |

As a result of the foregoing, Marjorie received from the corporate debtor $313,404.91 more than she invested.

Lillian Parise's investment receipts:

| Date | Amount |
|---|---|
| 2/28/03 | $5,000.00 |
| 3/26/03 | $5,000.00 |
| 6/30/03 | $5,000.00 |
| 9/05/03 | $5,000.00 |
| 10/16/03 | $5,000.00 |
| 12/06/03 | $5,000.00 |
| **Total:** | **$30,000.00** |
| **Invested**: | **$30,000.00** |
| **Net Total** | **- 0 -** |

Robert Parise's investment receipts:

| Date | Amount |
|---|---|
| 5/07/03 | $24,200.00 |
| 5/14/03 | $5,800.00 |
| **Total:** | **$30,000.00** |
| **Invested:** | **- 0 -** |
| **Net Total** | **$30,000.00** |

## DISCUSSION

11 U.S.C. § 544(b) gives the trustee the rights of a creditor under state law to avoid transfers by a debtor. New Jersey has adopted the Uniform Fraudulent Transfer Act, N.J.S.A. 25:2-20 et seq.. N.J.S.A. 25:2-25 entitled "Transfers fraudulent as to present and future

creditors" provides: "a transfer made . . . by a debtor is fraudulent as to a creditor . . . if the debtor made the transfer . . . with actual intent to hinder, delay or defraud any creditor of the debtor." A fraudulent transfer is avoidable. N.J.S.A. 25:2-29(a)(1).

A Ponzi scheme is named after Charles Ponzi whose exploits were recounted by the United States Supreme Court:

> The litigation grows out of the remarkable criminal financial career of Charles Ponzi. In December, 1919, with a capital of $150, he began the business of borrowing money on his promissory notes. He did not profess to receive money for investment for account of the lender. He borrowed the money on his credit only. He spread the false tale that on his account he was engaged in buying international postal coupons in foreign countries and selling them in other countries at 100 per cent, profit, and that this was made possible by the excessive differences in the rates of exchange following the war. He was willing, he said, to give others the opportunity to share with him this profit. By a written promise in ninety days to pay the $150 for every $100 loaned, he induced thousands to lend him. He stimulated their avidity by paying his ninety-day notes in full at the end of the forty-five days, and by circulating the notice that he would pay any unmatured note presented in less than forty-five days at 100% of the loan. Within eight months he took in $9,582,000 for which he issued his notes for $14,374,000. He paid his agents a commission of 10 per cent. With the 50 per cent promised to lenders, every loan paid in full with the profit would cost him 60 per cent. He was always insolvent and became daily more so, the more his business succeeded. He made no investments of any kind, so that all the money he had at any time was solely the result of loans by his dupes.

*Cunningham v. Brown*, 265 U.S. 1, 7-8 (1924).

In the case of *Liebersohn v. Campus Crusade for Christ, Inc.*, (*In re C.F. Foods, L.P.*), 280 B.R. 103, 110 (Bankr. E.D.Pa. 2002) the bankruptcy court wrote: "Numerous courts have decided that a debtor's actual intent to hinder, delay or defraud creditors may be inferred from the Debtor's active participation in a Ponzi scheme." The United States District Court in Utah

has written:

> One can infer an intent to defraud future undertakers [investors] from the mere fact that a debtor was running a Ponzi scheme. Indeed, no other reasonable inference is possible. A Ponzi scheme cannot work forever. The investor pool is a limited resource and will eventually run dry. The perpetrator must know that the scheme will eventually collapse as a result of the inability to attract new investors. The perpetrator nevertheless makes payments to present investors, which, by definition, are meant to attract new investors. He must know all along, from the very nature of his activities, that investors at the end of the line will lose their money. Knowledge to a substantial certainty constitutes intent in the eyes of the law, *cf. Restatement (Second) of Torts § 8A* (1963 & 1964), and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them. *Cf. Coleman Am. Moving Servs., Inc. v. First Nat'l Bank & Trust Co. (In re American Properties, Inc.)*, 14 B.R. 637, 643 (Bankr. D. Kan. 1981) (intentionally carrying out a transaction with full knowledge that its effect will be detrimental to creditors is sufficient for actual intent to hinder, delay or defraud within the meaning of § 548(a)(1)).

*Universal Clearing House Co. v. Abbott (In re Independent Clearing House)*, 77 B.R. 843, 860 (D. Utah 1987).

Furthermore, the bankruptcy court in Ohio has stated:

> A Ponzi scheme is a fraudulent investment arrangement under which an entity makes payments to investors from monies received from new investors rather than from profits generated by legitimate business operations, although investors may believe an actual business exists from which profits are derived.

> *Rieser v. Hayslip (In re Canyon Systems Corp.),* 343 B.R. 615, 629 (Bankr. S.D.OH 2006).

> To prove that (the Debtor) engaged in a Ponzi scheme, the Trustee must establish that: (1) deposits were made by investors; (2) the Debtor conducted little or no legitimate business operations as represented to investors; (3) the purported business operation of the Debtor produced little or no profits or earnings; and (4) the source of payments to investors was from cash infused by new investors.

*Id.* at 630.

The evidence in this case leads to the inescapable conclusion that Winters knew that this scheme would eventually collapse and that future investors would not be paid. The facts that lead to this conclusion are:

1. The solicitation materials were fraudulent. There was a promise of an unrealistically high return of 25% guaranteed and fictitious historical data showing greater than 100% profits.

2. Customer account statements were fraudulent. Marjorie Parise's account showed over 200% increase in one year – it was completely fabricated.

3. Payments to sales representatives to solicit new investors were exorbitant. Several employees were given a brand new BMW automobile, vacations and cash bonuses.[3]

4. Separate accounts were not kept for investments by each customer. Funds were commingled.

5. The principal looted the company of millions of dollars.

---

[3] According to the Securities and Exchange Commission, "Hedge funds typically charge an asset management fee of 1-2% of assets, plus a 'performance fee' of 20% of a hedge fund's profits". www.sec.gov/answers/hedge.htm. Global Trading Investments' assets under management totaled $4 million and it made no profits. Its management fee at 2% would come to $80,000.00 per year. That gross income hardly warranted buying cars for several employees, vacations or bonuses. Nor would a commission of 10% be justified.

6. Investor funds were used to repay earlier investors.

7. The New Jersey Bureau of Securities initiated a civil proceeding due to the fraudulent activity. The debtors agreed to pay a $100,000.00 penalty, refund all investors funds and refrain from violations of the securities laws.

Based upon the foregoing, the court concludes that the entire operation of the corporate debtor was a fraudulent enterprise. Therefore, under the numerous cases that have discussed Ponzi schemes, all payments to investors were the product of actual fraud.[4]

Defendants point to one brokerage account maintained by the corporate debtor as evidence that Global Trading Investors operated a legitimate business. They argue that while Winters may have stolen money from later investors, they should be allowed to keep not only their original investment but the profit of more than 200%. The fallacy in that argument is that the brokerage account statement shows the corporate debtor lost money in its trading account. The "profits" paid to the Parises was actually money paid by later investors – there were no profits.

## CONCLUSION

The Global Trading Investments was a fraudulent enterprise from inception. All payments to defendants were made with actual intent to defraud creditors. The Trustee is entitled to avoid the transfers at least to the extent they exceed the defendants' investment in the debtor.

---

[4] The actual fraud was perpetrated by the debtor. The court has made no findings with regard to the intent of the defendants as transferees. Their good faith is the subject to be determined after trial.

With regard to the return of their investments, the defendants will be allowed an opportunity to prove their defense under N.J.S.A. 25:2-30(a) that they took the transfer in good faith.


October 25, 2006                                          */S/ Raymond T. Lyons*,
                                                          United States Bankruptcy Judge